IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| GIBSON, INC., a Delaware corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 6:25-cv-00424 |
| vs. ) | |
| ) | |
| DIMARZIO, INC., a New York corporation, ) | COMPLAINT |
| ) | |
| and ) | JURY TRIAL DEMANDED |
| ) | |
| DOES 1 through 10, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**

Plaintiff Gibson, Inc. ("Gibson" or "Plaintiff") hereby brings this action against Defendant DiMarzio, Inc. ("Dimarzio" or "Defendant") and DOES 1 through 10, alleging the following:

**Nature of Action**

1.      Gibson, the world's premier guitar company, sues DiMarzio, a parts manufacturer and seller, for its wrongful attempts to use fraudulently obtained trademark registrations to prevent Gibson from using generic and functional technology and adornment that Gibson developed.

2.      More specifically, Gibson sues to cancel pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119, DiMarzio's Registration Nos. 1,169,205 and 1,096,579 on the grounds the marks are generic, functional ('205), and were procured or maintained through fraud.   Further, Gibson seeks a Declaratory Judgment that it is not infringing or diluting DiMarzio's Registration Nos. 1,169,205 and 1,096,579 and/or the marks are not valid.

3.      In addition, Gibson asserts claims for tortious interference with Gibson's existing and prospective business relationships and/or contracts pursuant to Texas common law based on

DiMarzio sending tortious communications to Gibson's current and prospective dealers.

## PARTIES

4.      Plaintiff Gibson is a Delaware corporation with a principal place of business at 209 10th Avenue South, Nashville, TN 37223.

5.      Upon information and belief, Defendant DiMarzio, Inc. is a New York corporation with a principal place of business located at 1388 Richmond Terrace, Staten Island, New York 10310.

6.      The true names and capacities of Defendants DOES 1 through 10 are unknown to Gibson, who therefore sues said Defendants by such fictitious names.  Gibson is informed and believes and thereon alleges that each of the Defendants designated herein as a fictitiously named Defendant is, in some manner, responsible for the events and happenings herein referred to, either contractually or tortuously, and caused damage to Gibson as herein alleged.  When Gibson ascertains the true names and capacities of DOES 1 through 10, it will ask leave of this Court to amend its Complaint by setting forth the same.

## JURISDICTION AND VENUE

7.      Original subject matter jurisdiction of this Court is based on 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) and (b) (Acts of Congress relating to trademarks and related actions), Sections 39 and 43(a) and (c) of the United States Trademark Act of 1946 ("Lanham Act"), as amended (15 U.S.C. §1121 and 1125(a)(c)). This court has supplemental jurisdiction over Gibson's state law claims pursuant to 28 U.S.C. § 1367 (Supplemental Jurisdiction) because they are substantially related to Gibson's federal claims and arise out of the same case or controversy, as well as the principles of pendent jurisdiction.

8.      Subject matter jurisdiction of this Court is also based on 28 U.S.C. § 1332

(diversity jurisdiction) because complete diversity exists between the parties and the amount in controversy requirement is met: Gibson is a citizen of Delaware and Tennessee, and DiMarzio is a citizen of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      This action arises out of DiMarzio's wrongful acts including sending cease and desist letters to Gibson's dealers and prospective dealers who do business within this judicial district regarding DiMarzio's Registration Nos. 1,169,205 and 1,096,579.  This Court has personal jurisdiction over DiMarzio under the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042, as it conducts business in the State of Texas and the exercise of such jurisdiction is consistent with due process under the United States Constitution.  In addition, DiMarzio has minimum contacts within the State of Texas and the Western District of Texas; and DiMarzio's contacts with the State of Texas arise from, or are directly related to, DiMarzio's cause of action.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), as DiMarzio is subject to personal jurisdiction in this District and a substantial part of the events giving rise to these claims occurred in this District. DiMarzio sent cease and desist letters to Gibson dealers, including Sweetwater and Guitar Center, that advertise and sell in this District.  Because of those letters, Gibson has lost business, lost revenue, and suffered reputational harm.

**Gibson's Creation and Popularization of the Famous Cream-Colored PAF Humbucker Pickup Design in the Late 1950s-Early 1960s.**

11.     Gibson is a corporation organized in Delaware and is engaged in the business of the manufacture and sale of musical instruments, electronics, entertainment systems, clothing, pianos, jukeboxes, and musical equipment as well as providing entertainment services.

12.     Since its founding in 1894, Gibson has been an industry-leader in innovating instruments and electronics.  One such invention is the "Patent Applied for" or "PAF" humbucker

pickup.

13.     Gibson's Seth Lover invented the "PAF" humbucker pickup, and it is famous in the industry for its ground-breaking sound technology and for being the first humbucker used with electric guitars.

14.     Pickups consist of a series of coils, magnets, and bobbins that use electromagnetic induction to convert vibrations made by the strings of an electric guitar into electrical signals, resulting in an electric guitar's distinctive sound when the guitar is plugged into an amplifier.

15.     Pickups originated as single coil, meaning the pickup had only one coil of wire wrapped around a magnet.  Single-coil pickups are known for producing smooth, bright, treble-focused sounds with relatively low energy.[1]  This results in a relatively low output level, reduced low-frequency response, and a tendency to pick up "hum" and other noises.

16.     By the mid-1950s, Gibson sought to develop an alternative to single-coil pickups that would reduce hum.

17.     In early 1955, Gibson's employee, Seth Lover, engineered an alternative pickup that utilized a pair of single coils wound in opposite directions, resulting in reverse polarity and giving the magnetic field more strength.  This "double-coil" design effectively canceled out the "hum" produced by single-coil pickups, resulting in the name "hum-bucker."  Humbucker pickups result in stronger bass frequencies, more power, and higher output.

18.     In June 1955, Gibson and Seth Lover filed a patent on the humbucker pickup design, and by 1956, Gibson began outfitting its guitars with the double-coil pickups.

19.     Between the years of 1956 through 1962, Gibson applied a small black decal on the baseplate of each humbucker pickup that read "Patent Applied For"—even after the patent was

---

[1] Single-coil pickups were also available in cream before the humbucking pick-up was invented.

4

granted—and soon, the iconic pickups made during this time became widely known as "PAFs."

20.     Gibson's PAFs became highly sought after, gaining recognition as the "most revered and elusive pickup" ever made, the "Holy Grail of all electric guitar pickups," and "one of the most defining inventions in the history of rock 'n' roll."[2]

21.     Part of the PAF's notoriety came from its use on one of Gibson's most iconic guitars ever made: the Gibson Les Paul® Standard guitar in the sunburst finish.

22.     There are many distinguishing features of the Gibson Les Paul® Standard guitar, such as the sunburst finish and the cream-colored pickguard, toggle switch washer, pickup mounting rings, and, most notably, the PAF humbucker pickups.

     

Gibson's 1959 Les Paul® Guitar in sunburst.    Gibson's cream-colored humbucker pickup.

23.     Though Gibson's Les Paul® Standard guitar came with a metal plate covering the humbucker pickup, it became "fashionable" and common for musicians to remove the metal plates and play with the humbucker pickups showing.[3]

---

[2] *See* Huw Price, "Why Gibson humbuckers remain the most revered and elusive of all pickups," GUITARIST (published September 11, 2025) (attached as **Exhibit A**), https://www.guitarworld.com/features/gibson-paf-pickups; *see also* Brandon Stoner, "A brief history of Gibson," GUITAR.COM (published September 11, 2025), https://guitar.com/features/brief-history-of-gibson (attached as **Exhibit B**).
[3] *See* Price, *supra* note 2 (Exhibit A).

24.     By early 1959, the bobbins on the pickup began to appear in the color cream due to supply issues.[4]  This resulted in the color combination known as "double cream" and "double white," which Gibson produced through 1960.

25.     Gibson's PAF humbucker pickups either appeared in double cream, double black, or a combination of cream and black, resulting in the color combination known as "zebra."  The PAF humbuckers that appeared on the Les Paul® Standard guitar in sunburst were double cream in color.

  

Gibson's PAF humbucker in double cream.

Gibson's PAF humbucker in double black.

Gibson's PAF humbucker in "zebra."

26.     Due to the popularity of the PAFs and Gibson's sunburst Les Paul® Standard guitar, Gibson's double cream PAF humbucker pickups quickly became highly collectible and widely desired.

27.     Today, guitar players and collectors hope to find one of the ever-elusive "Gibson PAF humbuckers," particularly in the double cream color.

**In 1974, DiMarzio Copies Gibson's Cream-Colored Humbucker Design and Makes Misrepresentations to the USPTO.**

28.     Pickup manufacturers have widely used the cream color and double cream colors since at least 1959.

---

[4] *See Id*. The double cream incarnation was the most desirable because of the direct association with famous guitars and collectable models. The most common year to initially see the double cream combination was 1959.

29.     Furthermore, since 1959, pickup manufacturers have boldly used the term "PAF" to market those pickups, hoping to attract guitar players searching for Gibson's PAF humbucker pickups.

30.     For example, DiMarzio allegedly first used the cream color pickups in 1974 and the word "PAF" since 1976.

31.     On December 1, 1977, DiMarzio filed its application for the double cream humbucker design mark, claiming a first use date of February 1974 ("Double Cream Humbucker Application"). The USPTO granted DiMarzio registration for the Double Cream Humbucker mark on September 15, 1981.



DiMarzio's '205 mark in "the color yellow which resembles the distinctive shade of cream."[5]

32.     DiMarzio's Vice President, Steve Blucher, submitted a Declaration dated November 15, 1977, in support of DiMarzio's Double Cream Humbucker Application ("Blucher Double Cream Humbucker Declaration"). [*See* Blucher Double Cream Humbucker Declaration attached hereto as **Exhibit C**.]

---

[5]     *See* TSDR Page for Registration No. 1169205, USPTO, available at: https://tsdr.uspto.gov/#caseNumber=1169205&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch (last visited Sept. 12, 2025).

33.    In the Blucher PAF Declaration, Blucher states, among other things:

[H]e believes **[DiMarzio] to be the owner of the trademark** sought to be registered; that to the best of his knowledge and belief, **no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other persons, to cause confusion, to cause mistake, or to deceive**.

[*See* Blucher Double Cream Humbucker Declaration (emphasis added), Exhibit C.]

34.    On January 17, 1979, the USPTO issued an office action ("January 17, 1979 Office Action"), wherein the Examining Attorney refused to register the Double Cream Humbucker mark, stating: "Registration is refused on the Principal Register because the matter presented for registration constitutes a configuration of the goods and, as such, is **merely descriptive of the goods**.  In the absence of evidence that it has a secondary meaning or has become distinctive as applied to the goods, it may not be registered on the Principal Register."  [*See* January 17, 1979 Office Action attached hereto as **Exhibit D**.]

35.    Larry DiMarzio, the founder and Chief Executive Officer of DiMarzio, submitted a declaration dated July 5, 1979, in support of DiMarzio's response to the January 17, 1979 Office Action ("DiMarzio July 5, 1979 Declaration").  [*See* DiMarzio July 5, 1979 Declaration attached hereto as **Exhibit E**.]

36.    In the DiMarzio July 5, 1979 Declaration, Larry DiMarzio states:

I believe the corporation to be the owner of the trademark sought to be registered, that to the best of my knowledge, **no other person, firm, corporation, or association has the right to use said mark in commerce**, either in identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other person, to cause mistake, or to deceive.

I am the founder of the applicant corporation, and have been actively engaged in the music business, and in particular with guitars for approximately fourteen years, both as a professional player and as a technician, building, designing and repairing electronic guitars and their components.

In the electronic guitar field, there are one or two giants, whose products, particularly in the 1950's, were well known for their sound quality.

As a player and someone professionally engaged in the repairing of guitars, I became familiar with guitars and pickups on the market, and **prior to the introduction of the cream-colored double bobbin configuration of the present application, no guitar pickups were identified by the cream-colored double bobbin configuration**, nor were replacement pickups sold, nor original guitars sold with pickups exposing their bobbins.

**Almost universally, the bobbins in pickups, prior to the introduction of the pickups of the present application, were black or navy blue**.

The cream-colored double bobbin of the present application was designed primarily as a replacement pickup for the pickup in a Les Paul Gibson Guitar, or a replacement for a Gibson ES-175. I believe that the pickup in the ES-175 or the pickup in the **Gibson Les Paul guitar, came on the market in approximately 1957, with black bobbins under a cover**.

I further believe that that particular pickup is identified in a patent application by Seth Lover, applied for in 1955, wherein it is suggested that the cover be maintained on the pickup to reduce the background noise level.

**To my knowledge, the pickup bobbins under the covers in the Les Paul guitars were always either black or black-like navy blue, with the exception of a very short period in 1959, when some bobbins may have been white**.

This short run of bobbins in the Les Paul guitar would appear to be involved with an accident of a shortage of pigment, since such bobbins only had that color for a short time and for a short time some of the white bobbins in double bobbin Les Paul pickups were even combined with black bobbins.

[*See* Exhibit E (emphasis added).]

37.    Upon information and belief, the emboldened portions of the foregoing statements are either misleading or partially or entirely false.

38.    Upon information and belief, the USPTO relied upon the foregoing statements made by DiMarzio when it granted DiMarzio the Double Cream Humbucker registration on September 15, 1981.

39.    On June 22, 1987, five years after the USPTO issued DiMarzio's registration for

the Double Cream Humbucker mark, Larry DiMarzio, the President of DiMarzio, filed a combined declaration under Trademark Act Sections 8 and 15. [*See* June 22, 1987 DiMarzio Declaration attached hereto as **Exhibit F**.]

40.    In the declaration, Larry DiMarzio stated, "he believes [DiMarzio] to be the owner of the trademark cited in the within declaration; that to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other persons, to cause mistake, or to deceive." [*See* June 22, 1987 DiMarzio Declaration.]

41.    Upon information and belief, the USPTO relied upon these statements made by DiMarzio when it accepted DiMarzio's Trademark Act Section 8 and 15 Declaration on April 1, 1988.

### In 1976, DiMarzio Copies Gibson's PAF Mark and Makes Misrepresentations to the USPTO.

42.    On February 18, 1977, DiMarzio filed its application for the PAF wordmark, claiming a first use date of June 1976 ("PAF Application"), and the USPTO granted DiMarzio registration for the PAF wordmark on July 18, 1978.

43.    DiMarzio's Vice President, Steve Blucher, submitted a Declaration dated February 15, 1977, in support of DiMarzio's PAF Application ("Blucher PAF Declaration"). [*See* Blucher PAF Declaration attached hereto as **Exhibit G**.]

44.    In the Blucher PAF Declaration, Blucher states, among other things:

[H]e believes **[DiMarzio] to be the owner of the trademark** sought to be registered; that to the best of his knowledge and belief, **no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other persons, to cause confusion, to cause mistake, or to deceive**.

[*See* Blucher PAF Declaration, Exhibit G (emphasis added).]

45.    During the prosecution of the PAF Application, the USPTO issued an office action on August 11, 1977 ("August 11, 1977 Office Action"), wherein the Examining Attorney raised several issues with the PAF Application, specifically asking DiMarzio: "**Does the term PAF have any established and/or accepted significance or meaning within the applicant's trade or industry?**" [*See* August 11, 1977 Office Action attached hereto as **Exhibit H** (emphasis added).]

46.    DiMarzio filed its response to the August 11, 1977 Office Action on February 3, 1978 ("February 3, 1978 Response"), wherein DiMarzio stated, among other things, that DiMarzio's PAF pickup "**is a specific replacement part to fit into a particular guitar sold under the trademark GIBSON**." [*See* February 3, 1978 Response attached hereto as **Exhibit I**, at p. 2 (emphasis added)*.*]

47.    Next, DiMarzio responded to the Examining Attorney's question, stating: "**PAF has no established and/or accepted significance or meaning within the applicant's industry**." [*See Id*. (emphasis added)*.*]

48.    Only a few sentences later, DiMarzio then stated: "Since all Gibson guitars and pickups are sold under the Gibson trademark, the desired tone or tonal quality of the vintage pickup is **sometimes identified by referring to it as the sound in the Gibson Humbucking pickup which carried the marking 'patent applied for**.'" [*See Id.* at p. 2-3 (emphasis added).]

49.    Upon information and belief, the emboldened portions of the foregoing statements are either misleading or partially or entirely false.

50.    Upon information and belief, the USPTO relied upon the foregoing statements made by DiMarzio when it granted DiMarzio the PAF registration on July 18, 1978.

51.    On April 10, 1984, five years after the USPTO issued DiMarzio registration for the

PAF wordmark, Larry DiMarzio, the President of DiMarzio, filed a combined declaration under Trademark Act Sections 8 and 15. [*See* April 10, 1984 DiMarzio Declaration attached hereto as **Exhibit J**.]

52.     In the declaration, Larry DiMarzio stated, "he believes [DiMarzio] to be the owner of the trademark cited in the within declaration; that to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other persons, to cause mistake, or to deceive." [*See* April 10, 1978 DiMarzio Declaration.]

53.     Upon information and belief, the USPTO relied upon these statements made by DiMarzio when it accepted DiMarzio's Trademark Act Section 8 and 15 Declaration on July 18, 1978.

**Later Admissions Make Clear DiMarzio Purposefully Made False Statements to the USPTO During the Prosecution of the Double Cream Humbucker and PAF Applications.**

54.     On September 17, 2007, Larry DiMarzio uploaded a video to the video platform YouTube entitled: "Larry DiMarzio's Original Vintage 1959 Gibson Les Paul® Cherry Sunburst Guitar" ("DiMarzio Video").



[*See* "Larry DiMarzio's Original Vintage 1959 Gibson Les Paul® Cherry Sunburst Guitar", YOUTUBE, available at: https://www.youtube.com/watch?v=N7IlR53ca9M (last visited May 31, 2024).]

55.     The DiMarzio Video features various shots of Larry DiMarzio's 1959 Gibson Les Paul guitar while Larry DiMarzio narrates.

56.     Larry DiMarzio's Gibson Les Paul® guitar appears to be in the Cherry Sunburst finish with cream-colored accessories, including the switch washer, the pickguard, the toggle switch washer, the pickup mounting rings, and the **humbucker pickups.**

57.     In the DiMarzio Video, Larry DiMarzio demonstrates his in-depth, technical knowledge of the Gibson Les Paul guitar and its humbucker pickups, its history, and the modifications taking place throughout the 1950s through present day.

58.     At around 0:45 into the DiMarzio Video, Larry DiMarzio states: "By '58, [Gibson] had introduced full-size humbuckers, another improvement in the development of the guitar."

13

59.    At around 1:14 into the DiMarzio Video, Larry DiMarzio states: "There were only 1,700 of these guitars made, and very few with double cream and black and cream pickups."

60.    At 1:22, Larry DiMarzio explains: "Gibson designed the pickups with covers on, and it was guitar players who took the covers off."

61.    In the DiMarzio Video at 1:43, Larry DiMarzio confirms that he purchased the Gibson Les Paul® guitar in the Cherry Sunburst finish in the early 1970s.

62.    At 2:20, the DiMarzio Video cuts to a close-up shot of what Larry DiMarzio states is an "original patent-applied-for pickup."



[*See* "Larry DiMarzio's Original Vintage 1959 Gibson Les Paul® Cherry Sunburst Guitar", YOUTUBE, available at: https://www.youtube.com/watch?v=N7IlR53ca9M (last visited May 31, 2024).]

63.    He explains, "[o]n the bottom, there's a sticker that says, 'Patent Applied For,'" before zooming in on the Gibson PAF pickup and its signature sticker.



[*See* "Larry DiMarzio's Original Vintage 1959 Gibson Les Paul® Cherry Sunburst Guitar", YOUTUBE, available at: https://www.youtube.com/watch?v=N7IlR53ca9M (last visited May 31, 2024).]

64.    In the comment section to the DiMarzio Video, Larry DiMarzio responded to several comments to the video confirming this information and providing additional details.

65.    In several comments, Larry DiMarzio stated that he purchased the 1959 Gibson Les Paul® featured in the video in 1974—the same year DiMarzio claims it first used its imitation double cream humbucker pickup design, two years before DiMarzio claims it first used the PAF mark, and three years before DiMarzio filed the Double Cream Humbucker and PAF Applications.





66.     In another comment, Larry DiMarzio confirmed that Gibson Les Paul® featured in

the DiMarzio Video is equipped with the **original pickups** "because they sounded so good."



67.     In another comment, Larry DiMarzio explains that he kept his Gibson Les Paul®

original, "so [he] would have a **reference point for my new designs**."



68.     To be sure, Larry explained in another comment that the original pickups in the

1959 Gibson Les Paul that he purchased in 1974 featured ***cream pickups*** before noting that the

binding and mounting rings match in color.

 **@LarryDiMarzio** 12 years ago

Hi, Thanks for buying so many Super Distortions.
The original pickups are a cream. The same color as the binding and mounting rings. I did a version, PAF     36th Anniversary, that can be purchased in vintage shinny bobbins and looks very original. You can check them out on the DiMarzio website. (Youtube won't let you make direct links)
Hope that helps,
Larry DiMarzio
Show less

69.     Larry said to another commentator: "**What is important is that double cream and zebra pickups coincide with the 1959 [Gibson] guitars.** This (in my opinion) is the best year for the [Gibson] Les Paul, 335, and L5 production and I own all three." (emphasis added).

 **@LarryDiMarzio** 16 years ago

Hi,
You are right, there were variations. What is important is that double cream and zebra pickups coincide with the 1959 guitars. This (in my opinion) is the best year for the Les Paul, 335 and L5 production and I own all three. I owned an original 1958 Les Paul and sold it as soon as I could. By 1960 Gibson screwed up the neck on the Les Paul by making it too thin. My 1959 dot marker 335 has double blacks pickups and they are killer. Everything worked that year.
Hope this helps,
Larry DiMarzio
Show less

70.     DiMarzio's admissions confirm Larry DiMarzio possessed highly technical and historical knowledge regarding Gibson's double cream humbucker PAF pickups and the Gibson Les Paul® guitars they appeared on **at the time DiMarzio created its imitation products and prior to filing its trademark applications.**

71.     More specifically, these admissions made by Larry DiMarzio—the founder and President of DiMarzio—illustrate that DiMarzio was well-aware **as early as 1974** that Gibson invented, popularized, and owned the double cream humbucker pickup design when DiMarzio created its imitation double cream humbuckers and when it filed its Double Cream Humbucker Applications.

72.     Furthermore, these admissions show DiMarzio was well-aware **as early as 1974** that "patent applied for," or "PAF," had an **established and significant meaning in the guitar industry** as being the "patent applied for" humbucker pickups Gibson created and used with some

of its most popular and revered guitars of its history: the Les Paul, ES-335, and L-5 guitars of the late 1950s and early 1960s, and DiMarzio possessed this knowledge when it started using its PAF mark in 1976 and when it filed its PAF Application in 1977.

73.    Therefore, based on his own admissions, Larry DiMarzio's was aware **as early as 1974** that Gibson created, popularized, and owned the PAF and Double Cream Humbucker designs when he purchased his Gibson 1959 Les Paul guitar.

74.    Thus, Larry DiMarzio's admissions demonstrate that DiMarzio ***knowingly*** misrepresented and made false statements to the USPTO when prosecuting the Double Cream Humbucker Application and the PAF Application.

## **Throughout its History, DiMarzio Uses Gibson's Fame, Reputation, and Trademarks to Market and Sell its Imitation Cream-Colored PAF Humbucker Pickups.**

75.    Today, product listings for DiMarzio's cream-colored pickups specifically refer to the design from which they came—Gibson's 1959 Les Paul® guitar and its PAF humbucker pickups.

76.    Specifically, DiMarzio markets its cream-colored pickups by using the terms: "PAF 59," referring both to the iconic Gibson PAF humbucker pickups and 1959, the year of Gibson's sunburst Les Paul® guitar that popularized the cream colored PAF humbucker pickups.[6]  Of note, DiMarzio did not exist as an entity until the 1970s.

77.    As part of the product description for the goods sold under the '579 Registration, DiMarzio confirms that DiMarzio based the product's design on the PAF humbucker pickups invented by Gibson and popularized on Gibson's 1959 Les Paul® guitar.

---

[6]  *See e.g.* "PAF® 59 NECK," DiMARZIO (last visited Sep. 11, 2025), https://www.dimarzio.com/pickups/vintage-paf-output/paf-59-neck?v=31601 (attached as **Exhibit K**).

78.     For example, DiMarzio describes one product sold under the '597 Registration by making multiple references to Gibson, the 1959 Les Paul® guitar, and the famous Gibson "Patent Applied For" pickups, stating:

> These days, it seems as if everyone's looking for the legendary sound and dynamics of the original "Patent Applied For" pickups. Utilizing Larry DiMarzio's 1959 Cherry Sunburst Les Paul® for reference, DiMarzio used the same materials as 1959, gifted ears, and decades of winding experience to create the new PAF® 59 pickups.
>
> Larry says the PAF® 59 Neck and Bridge models were built following an "old family recipe." We started with a 2-½-inch degaussed Alnico 5 magnet. The 42 AWG enamel wire coils are un-dipped and scatter wound. They're tuned to capture the guitar's voice and dynamics without coloring it.
>
> The PAF® 59 Neck and Bridge models feature Double Cream™ butyrate bobbins on our long-leg nickel/silver base plate just like the originals. They are also available with black or black & cream butyrate bobbins.
>
> All materials are made in the U.S.A. to the tolerances of the best of the 1959 pickups.
>
> The PAF® 59 Neck and Bridge models have the open dynamics, bright attack, smooth midrange, and rich bottom end, along with the creamy distortion of the original "Patent Applied For" pickups
>
> Like the vintage "Patent Applied For" pickups, the PAF® 59 Bridge model has perfect harmonic range with exactly the right amount of oomph. It has a subtle roll off on the top end that sweetens the highs in the bridge position.[7]

79.     Furthermore, DiMarzio's product listing for its "PAF 59 Pickup" features an embedded video of a guitarist playing a *Gibson Les Paul*® outfitted with DiMarzio's pickup sold under the '579 Registration.

---

[7] *See Id.*



Screenshot of video embedded in the product listing for DiMarzio's '579 Goods.[8]

80.     Another product DiMarzio sells under the '579 Registration makes more references to Gibson, Gibson's 1959 Les Paul® guitar, Gibson's "Patent Applied For" humbucker pickups, and Seth Lover—the Gibson employee who invented the "Patent Applied For" humbucker pickups, stating:

> Here are the characteristics that make a great vintage humbucker: a soft magnetic field, sweet tone, perfect balance between warmth and clarity, the ability to go from clean to distorted by pick attack alone. For our PAF® 36th Anniversary Neck we wanted to continue in the path of pioneers such as Seth Lover (designer of the original Patent Applied For humbucker) and create pickups that combine all of the characteristics of great vintage humbuckers. These pickups are not merely clones. We re-engineered the PAF® using our patented technology and Larry DiMarzio's own 1959 cherry sunburst Gibson® Les Paul® as the reference. Larry's Gibson® Les Paul® has a uniquely amazing sound and it's not only due to the pickups — it's the total fusion of many elements of the guitar itself. Although the pickups have a weak magnetic field, the sound is well defined: almost like a single-coil. We duplicated the weaker magnetic field in order to allow the strings to vibrate longer, as well as focus and articulate the attack and output. We use computer-controlled winders to consistently layer the 42-gauge custom-coated wire, achieving the exact frequency response we want. Then it's dipped in our custom formula to eliminate squeal and microphonics. The cover is made from nickel-silver and our new plating makes it more magnetically transparent than the originals. The PAF® 36th Anniversary Neck is smooth but not muddy. It performs equally well in the neck or bridge, just as the best humbuckers from the 50s did. We'll build the PAF® 36th Anniversary any way you want it. Choose the bobbin style — vintage glossy or modern matte, the type of base — traditional, long-legged or standard, short-legged, and the type of cable — vintage single-conductor or 4-conductor. The PAF® 36th Anniversary Neck is available uncovered, and we also offer three types of covers: standard polished and plated, buffed with no plating, and our vintage worn cover

---

[8]     *See* "PAF® 59 BRIDGE," DiMarzio (last visited Sep. 11, 2025), https://www.dimarzio.com/pickups/vintage-paf-output/paf-59-bridge?v=28028 (attached as **Exhibit L**).

that looks so authentic and broken in that you'll swear it's been hanging around since 1959.[9]

81.    Thus, DiMarzio boasts that the goods sold under the '205 Registration and the '579 Registration are direct copies of Gibson's original double cream humbucker pickup design while using the "PAF" term the industry uses to refer to Gibson's humbucker pickups.

82.    DiMarzio promotes the DiMarzio's Goods as being associated with Gibson, Gibson's PAF humbucker pickups, and the Les Paul® guitar.

83.    The intended meaning and resulting commercial impression rendered by DiMarzio's Marks is that it is identical, substantially similar, or associated with the Gibson PAF humbucker pickup.

84.    With respect to the use of the double cream color on pickups and the term PAF, Gibson has priority over DiMarzio because Gibson's continuous use predates the DiMarzio's listed dates of first use or any other date on which DiMarzio may rely for purposes of priority.

85.    DiMarzio's '579 Registration is promoted to consumers as referring to the humbucker pickup originating from Gibson, and as such, DiMarzio's Marks would be considered by consumers as so resembling the Gibson's PAF humbucker pickup as to be likely to cause confusion, mistake, or deception as to the sources of the parties' respective goods.

86.    This is due to the guitar industry's strong association of double cream humbucker pickups and the term "PAF" with Gibson and, specifically, the guitars and pickups produced by Gibson during one of its most iconic periods of history.

87.    Since 1959, numerous third parties have attempted to capitalize on the popularity

---

[9] *See* "PAF® 36TH ANNIVERSARY NECK," DɪMARZɪO (last visited Sept. 11, 2025) https://www.dimarzio.com/pickups/vintage-paf-output/paf-36th-anniversary-neck (attached as **Exhibit M**).

of Gibson's PAF humbuckers and cream-colored guitar accessories by manufacturing, advertising, marketing, and selling pickups using the "PAF" term, the cream color, and the double cream color in the United States.

88.    For example, on March 27, 2019, the USPTO refused registration for DiMarzio's



design                          subject to Application No. 87213400 for "the distinctive cream color applied to . . . electronic sound pickup for guitars featuring a double coil design."[10]

89.    As part of its basis for refusal, the USPTO stated that "there is no direct evidence that consumers see the use of the color cream as identifying [DiMarzio] as the source of the goods . . . [and] **it does not appear that [DiMarzio] has exclusive use of the color cream on pickups**" (emphasis added).[11]

90.    The USPTO cited to numerous examples of other manufacturers using cream-colored pickups for guitars, including:

---

[10] *See* USPTO's March 27, 2019 Office Action refusing registration to DiMarzio's Application No. 87213400 (attached as **Exhibit N**).
[11] *See Id.*

*Kiesel*[12]



*Seymour Duncan*[13]



*Dragonfire*[14]



*Guitar Madness*[15]



---

[12] *See* "Pickup Configurator," KIESEL (last visited Sept. 11, 2025), https://www.kieselguitars.com/pickups (attached as **Exhibit O**).

[13] *See* "Seymour Duncan Custom Shop Little '78 Bridge Humbucker Strat Pickup – Cream," SWEETWATER (last visited Nov. 16, 2023) https://www.sweetwater.com/store/detail/Lil78C--seymour-duncan-custom-shop-little-78-humbucking-strat-pickup-cream?mrkgcl=28&mrkgadid=3248788027&rkg_id=0&product_id=Lil78C&campaigntype=shopping&campaign=aaShopping%20-%20Core%20-%20Guitars&adgroup=Guitars%20-%20Guitar%20Accessories&placement=google&adpos=1o3&creative=226299461162&device=c&matchtype=&network=g&gclid=EAIaIQobChMIzt3259613QIV0pCfCh09GAMNEAkYAyABEgJEIfD_BwE (attached as **Exhibit P**).

[14] *See* "Dragonfire A5 Bucker Pickups, Bridge + Neck Humbuckers ~ Choice of HH Set Colors," eBAY (last visited Sept. 11, 2025), https://www.ebay.com/itm/284828514282?var=586526821810&hash=item42511a37ea:g:BMUAAOSw1SFijZ5S&amdata=enc%3AAQAIAAAA0M6btBTYZq%2BprCkfCihxLLRc0Or0TEop0rfWrBMIQvuzkKt%2BtgNDlRq3vEYY27bmGrCHHCCM%2BW0ofSoT342RzodJ2E3SCrLn8eUdiwvjSMHW3r3BVN2GdwRv86th6kGSMYIKUxApye0fHRMPUhnGNzYg9FF6A6uBqyBKW1FCkC9JBqR5TY9pbVCDiIwdscA7RAkhXHcEkLP%2FHKJ4VGnYW98nFGwpr2A%2B2LZee8fJJ2RaxREJxD%2BIC3MPq1FIocpcyJVWBull3nYT4e1xgpzdkH0%3D%7Ctkp%3ABk9SR7jNxsT6Yg (attached as **Exhibit Q**).

[15] *See* "Guitar Madness G.M. Premium Alnico's Cream Strat Stratocaster® Neck pickup For Fender Cream," REVERB (last visited Sept. 11, 2025), https://reverb.com/item/5896369-guitar-madness-g-m-premium-alnico-s-cream-strat-stratocaster-neck-pickup-for-fender-cream (attached as **Exhibit R**).

*Yamaha[16]*



*GFS[17]*



*Bill Lawrence[18]*



*Cimar[19]*



91.    Based on these examples, the USPTO refused to grant DiMarzio trademark rights to the cream-colored pickup design shown in Application No. 87213400 for use with electric guitars.

92.    There exist numerous additional examples of third-party guitar and pickup manufacturers using the cream color on pickups without authorization from DiMarzio:

---

[16] *See* "Yamaha SG-200 Vintage Cream Humbucker 1970's/80's," REVERB (last visited Sept. 11, 2025), https://reverb.com/item/13000410-yamaha-sg-200-vintage-cream-humbucker-1970-s-80-s?gclid=EAIaIQobChMI252Xlt-13QIVBkSGCh1kqgXREAkYISABEgKBcPD_BwE&gclsrc=aw.ds&pla=1 (attached as **Exhibit S**).

[17] *See* "Cream Neodymium Single Pickup- True Vintage Sparkle - Kwikplug™ Ready," GUITAR FETISH (last visited Sept. 11, 2025), https://www.guitarfetish.com/KP--Cream-Neodymium-Single-Pickup-True-Vintage-Sparkle--Kwikplug-Ready_p_23255.html (attached as **Exhibit T**).

[18] *See* "Bill Lawrence L500-XLC Bridge Lead Electrical Guitar Pickup in Cream," REVERB (last visited Sept. 11, 2025), https://reverb.com/item/6062483-bill-lawrence-l500-xlc-bridge-lead-electrical-guitar-pickup-in-cream (attached as **Exhibit U**).

[19] *See* "Cimar Electric Guitars," GUITAR COMPARE (last visited Sept. 11, 2025), https://guitar-compare.com/wp-content/uploads/2017/11/1979_Ibanez_Leaflet_Cimar.pdf (attached as **Exhibit V**).

*Gibson*[20]



*Fender*[21]



[20] *See Gibson Les Paul Standard '50s Double Trouble Electric Guitar* GIBSON (last visited Sept. 11, 2025), https://www.sweetwater.com/store/detail/LPS5DCW25VCNH--gibson-les-paul-standard-50s-double-trouble-electric-guitar-vintage-cherry-sunburst?mrkgadid=3319278804&mrkgcl=28&mrkgen=gdsa&mrkgbflag=0&mrkgcat=guitars&acctid=2170000000 1645388&dskeywordid=824852044299&lid=39700048800208153&ds_s_kwgid=58700005374436429&device=c& network=g&matchtype=&adpos=largenumber&locationid=9010937&creative=706902477038&targetid=dsa-824852044299&campaignid=6730319005&awsearchcpc=1&gclsrc=aw.ds&gad_source=1&gad_campaignid=6730 319005&gclid=Cj0KCQjw5onGBhDeARIsAFK6QJY641TYEJL_mKqY1-P8la6wfqAW83lSR5br4Mel3gv9apBvbu3Cc-8aAuR7EALw_wcB (attached as **Exhibit W**).

[21] *See* "Fender Vintage Noiseless Strat Pickup Set," GUITAR CENTER (last visited Sept. 11, 2025) https://www.sweetwater.com/store/detail/099-2115-000--fender-vintage-noiseless-stratocaster-pickups?mrkgadid=&mrkgcl=28&mrkgen=&mrkgbflag=&mrkgcat=&acctid=21700000001645388&dskeywordid= 2316260427809&lid=92700080454169443&ds_s_kwgid=58700008743176688&ds_s_inventory_feed_id=9770000 0007215323&dsproductgroupid=2316260427809&product_id=099-2115-000&prodlang=en&channel=online&storeid=&device=c&network=g&matchtype=&adpos=largenu mber&locationid=9010937&creative=705256640089&targetid=pla-2316260427809&campaignid=21453452330&awsearchcpc=1&gclsrc=aw.ds&gad_source=1&gad_campaignid=21 453452330&gclid=Cj0KCQjw5onGBhDeARIsAFK6QJaBeEE_sYIh1OgSX6QnFPiVekt1We7hCA3BoEmDm0Hly n9pthgn-eMaAhyOEALw_wcB (attached as **Exhibit X**).

*Arbor Bridge*[22]



*Wilkinson*[23]



93.    The identified third parties either are not or were not licensees of DiMarzio at the time they used the color cream on pickups.

94.    The advertising and sales of these third-party cream color pickups—that are the same cream color as DiMarzio' registration—equal or exceed the advertising and sales of

---

[22]    *See* "Arbor Bridge Humbucker 80s," REVERB (last visited Sept. 11, 2025), https://reverb.com/item/48381163-arbor-bridge-humbucker-80s?gclid=CjwKCAiA9dGqBhAqEiwAmRpTCy6so15CePQwnnhSSst5R1KEUNh6nfT6ArplK G_06cq1njUvRjpgqBoCqd0QAvD_BwE&utm_campaign=17502909118&utm_content=campai gnid%3D17502909118_adgroupid%3D140586518849_productpartitionid%3D1895499322779 %3Dmerchantid%3D684539278_productid%3D48381163_keyword%3D_device%3Dc_adpositi on%3D_matchtype%3D_creative%3D604304775083&utm_medium=cpc&utm_source=google (attached as **Exhibit Y**).

[23]    *See* "Wilkinson Vintage Classic Alnico 5 Overwound Open Style Humbucker Pickups Set for Electric Guitar, Zebra," AMAZON (last visited Nov. 16, 2023), https://www.amazon.com/gp/aw/d/B0C538ZBXP/?_encoding=UTF8&pd_rd_plhdr=t&aaxitk=2 7848ca110598b753c7578807977a2f0&hsa_cr_id=2015855300701&qid=1700075748&sr=1-1-9e67e56a-6f64-441f-a281-df67fc737124&ref_=sbx_be_s_sparkle_mcd_asin_0_title&pd_rd_w=kN43n&content-id=amzn1.sym.417820b0-80f2-4084-adb3-fb612550f30b%3Aamzn1.sym.417820b0-80f2-4084-adb3-fb612550f30b&pf_rd_p=417820b0-80f2-4084-adb3-fb612550f30b&pf_rd_r=4W1B9DAX929ADM7NZE9F&pd_rd_wg=Rp7Dt&pd_rd_r=23a70f70 -51cf-4e42-8415-561f09a9e49d&th=1 (attached as **Exhibit Z**).

DiMarzio's cream colored pickups.

95.    Thus, the use of the color cream on pickups as used with guitars is ubiquitous and generic.

96.    Due to extensive use of the cream color by nearly all guitar and pickup manufacturers, the cream color as used on guitars and guitar accessories, such as guitar pickups, is ubiquitous and generic.

97.    Given the extensive third-party use of the color cream on pickups, the public does not perceive the color cream on pickups as a source identifier and the color does not identify a single source, including DiMarzio, and is thus generic.

98.    Furthermore, numerous third parties manufactured, advertised, marketed, and sold pickups using the term "Patent Applied For" or "PAF" in the United States since 1959 without authorization from DiMarzio. See, for example:

- Gibson Historic Collection Pickups[24]

- Xotic Raw Vintage PAF Humbuckers[25]

- Seymour Duncan PAF Pickups[26]

---

[24] *See e.g.* "Custombucker (Zebra, 2-Conductor, Unpotted, Alnico 3, 8K)," GIBSON (last visited Sept. 11, 2025), https://www.gibson.com/products/gibson-custombucker-double-black-true-historic-gold-cover-
tomerge2?srsltid=AfmBOooriXsPECglzz6uepzw1WwiUmadsGX8Ge2Ijl_tfuRgCcDnocCL
(attached as **Exhibit AA**) ("Years of research and testing by Gibson engineers resulted in a formula and process that replicates the sonic magic of the original Patent Applied For humbucker™ pickups from the 50s.").
[25] *See* "Humbucker Raw Vintage USA," XOTIC (last visited Sept. 11, 2025), https://users-new.xotic.us/shop/category/raw-vintage-usa-raw-vintage-pickups-humbucker-30 (attached as **Exhibit BB**).
[26] *See* "A Guide to Seymour Duncan PAF Pickups," Seymour Duncan (last updated Sept. 11, 2025), https://www.seymourduncan.com/blog/latest-updates/a-guide-to-seymour-duncan-paf-pickups attached as **Exhibit CC**).

- Wilkinson Vintage PAF Style Pickup[27]

- LAMSAM Sealed P.A.F. Style Humbucker Pickup[28]

- FLEOR PAF Style Humbucker Pickup[29]

99.    The identified third parties either are not or were not licensees of DiMarzio at the time they used PAF.

100.    The advertising and sales of these third-party pickups bearing PAF—that is identical to DiMarzio's PAF mark—equal or exceed the advertising and sales of DiMarzio's PAF.

101.    Given the extensive third-party use of PAF on pickups, the public does not perceive PAF as a source identifier and PAF does not identify a single source, including DiMarzio, and is thus generic.

102.    Thus, the word "PAF," though referring to the invention and original design of Gibson's PAF humbucker pickups, is also ubiquitous in the guitar industry and, therefore, generic.

103.    Because the use of the color cream is so ubiquitous in the guitar industry on guitar accessories, manufacturers commonly manufacture and sell guitar pickups in the cream color so that guitar consumers can get pickups to match the other cream-colored accessories on their respective guitars.

104.    Thus, the cream color as used on guitar pickups is functional because it serves the

---

[27] *See* "Wilkinson Classic Tone Ceramic PAF Style Humbucker Pickups for Les Paul Style Electric Guitar Chrome," Amazon (last visited Sept. 12, 2025), https://www.amazon.com/Wilkinson-Classic-Ceramic-Humbucker-Electric/dp/B085ZDL6TV?th=1 (attached as **Exhibit DD**).

[28] *See* "LAMSAM Sealed P.A.F. Style Humbucker Pickups Set," AMAZON (last visited Sept. 11, 2025), https://www.amazon.ca/LAMSAM-Humbucker-Electric-Humbucking-Included/dp/B0BHQ9HBGW?th=1 (attached as **Exhibit EE**).

[29] *See* "FLEOR PAF Style Humbucker Pickup Ceramic Guitar Bridge Pickup Set Chrome Fit Les Paul Style Electric Guitar," AMAZON (last visited Sept. 12, 2025), https://www.amazon.ae/FLEOR-Humbucker-Pickup-Ceramic-Electric/dp/B0BTLSK6HY?th=1 (attached as **Exhibit FF**).

functional purpose of matching the other guitar accessories appearing on a guitar.

105.    Furthermore, the cream-colored accessories serve additional functions of providing a complimentary color to the finish of the guitar, providing contrast when winding the bobbins, and cost less than black-colored bobbins.

106.    Upon information and belief, DiMarzio was aware of these facts when it applied for the '205 Registration and the '579 Registration.

107.    Upon information and belief, DiMarzio purposefully made false statements to the USPTO when applying for the DiMarzio's Marks regarding DiMarzio's ownership of and superior rights to the double cream humbucker pickup design and the term "PAF" as used with DiMarzio's Goods.

### DiMarzio's Tortious Interference

108.    On November 17, 2023, Gibson filed a Petition with the United States and Patent Office to Cancel the DiMarzio's Marks based on, among other things, functionality and genericness.

109.    Subsequently, Gibson learned that on August 15, 2024, DiMarzio emailed Michael Doyle and Matthew Schneider, who at the time were both Vice Presidents of Guitar Center.  Upon information and belief, Mr. Doyle and Mr. Schneider are no longer with Guitar Center.

110.    Guitar Center is the largest American musical retail instrument retailer in the country with over 300 locations, including one located at 4314 W Waco Dr., Waco, Texas 76710.

111.    The email's subject line to the higher ups at Guitar Center was "Misleading Trademark Usage" and the body of the email stated:

Hi Michael and Matthew,

It has come to our attention that Gibson is using DiMarzio's registered trademarks on certain products sold by Guitar Center. The color of double cream bobbin humbuckers has been a DiMarzio registered trademark since 1981. We are requesting that all retailers not participate in misleading the public as to the source of double cream humbuckers in our color.

We've found this product on your website, and we are hoping to avoid any complications as to this product. I have also attached an image for reference that shows DiMarzio double cream humbuckers, purchased from DiMarzio by Gibson for its Ace Frehley Les Paul Model. Gibson has not purchased the pickups from DiMarzio for this Jeff Beck model. They are not a licensee of DiMarzio. In addition, under the specs for this Jeff Beck Les Paul model – they state that that (sic) the color is 'double classic white' (see attached). That color is actually our double cream color.

We appreciate your cooperation and help with this matter by taking down this photo.

All the best,
Matt

112.    Upon information and belief, Matt in the correspondence is Matthew Grayson, DiMarzio's Director of Media, OEM Sales Manager at DiMarzio.

113.    Around August 2025 (the following year), Gibson learned that DiMarzio sent correspondence to its dealers that stated:

Dear DiMarzio Dealer,

Recently Gibson has begun to sell guitars known as "Double Trouble" models in their Les Paul series of guitars. These "Double Trouble" guitars have matching double cream exposed coil humbucker pickups in a specific shade of crème. As you may know, the color of double crème bobbin humbucker pickups has been a registered trademark of DiMarzio since 1981 (USPTO Reg. No. 1169205). DiMarzio has been in contact with Gibson about its blatant infringement of DiMarzio's double crème mark. It has recently come to our attention that numerous dealers have been running advertisements on various Meta platforms for Gibson's "Double Trouble" guitars that infringe on DiMarzio's trademark rights. We are requesting that all retailers not participate in such advertisements that mislead consumers as to the source of humbuckers in that color, and that Gibson usage is likely to cause confusion among consumers.

In the past, Gibson has sourced directly from DiMarzio double crème humbuckers for certain guitars. These guitars have been sold by numerous dealers and other

distributors, and the ads for those guitars had had the correct attribution as to the source of those pickups – and that is DiMarzio – perhaps most commonly recognizable in the Ace Frehley Les Paul model. Gibson now appears to be running a campaign of selling guitars with Gibson's own "Double Classic White" pickups that are more like DiMarzio's double crème mark rather than "white" as implied. DiMarzio is concerned that Gibson's blatant infringement is coordinated with attempts to re-write MI history.

DiMarzio has been a member of the MI industry since the early 1970's. We recognize the importance of all dealers and distributors in our industry and value our relationships, regardless of whether DiMarzio products are carried. We would appreciate your cooperation with this matter by removing the advertisements of products that infringe on the DiMarzio double crème trademark.

Sincerely,
DiMarzio Inc.

114.    Sweetwater, an online American musical instrument retailer, is a dealer of both DiMarzio and Gibson products.

115.    Sweetwater is Gibson's largest dealer for pickups (by volume).

116.    Upon information and belief, after Sweetwater received the same or similar communications from DiMarzio, Sweetwater notified Gibson that it would not order any aftermarket double white pickups[30] from Gibson.  In the industry, aftermarket refers to when a pickup is sold on its own.

117.    The aforementioned acts of DiMarzio have caused, and unless enjoined will continue to cause, irreparable damage to Gibson.

118.    Gibson has no adequate remedy at law.

## COUNT I
## Declaratory Judgement of Non-Infringement of the DiMarzio's Registration No. 1,169,205 ("'205 Registration")

119.    Gibson hereby repeats and incorporates paragraphs 1-118.

---

[30] Gibson currently refers to its double cream pickups as double classic white and double vintage white.

120.     An actual, justiciable, and continuing case or controversy exits between Gibson and DiMarzio regarding Gibson's alleged infringement of DiMarzio's '205 Registration. DiMarzio has accused Gibson of infringing the '205 Registration.  Gibson denies the allegations.

121.     DiMarzio cannot establish priority over the '205 Registration, cannot establish the '205 Registration was distinctive prior to Gibson's use, nor can DiMarzio establish a valid, protectible interest in the '205 Registration.

122.     There is no likelihood of confusion, mistake, or deception as to the affiliation, connection, or association of DiMarzio with Gibson as to the origin, sponsorship, or approval of the parties' respective products.

123.     Gibson is therefore entitled to a judicial declaration that Gibson: (a) has not infringed, and is not infringing, the '205 Registration pursuant to 15 U.S.C. § 1114(1); (b) has not engaged in and is not engaging in counterfeiting of the '205 Registration 15 U.S.C § 1114(1); and (c) has not engaged in and is not engaging in false designation of origin or unfair competition with respect to the '205 Registration pursuant to 15 U.S.C. § 1125(a).

124.     Alternatively, Gibson is entitled to a judicial declaration that Gibson is the senior user to the '205 Registration and DiMarzio cannot prevent Gibson from using the mark.

<u>COUNT II</u>
**Declaratory Judgement of No Dilution of the '205 Registration**

125.     Gibson hereby repeats and incorporates paragraphs 1-118.

126.     DiMarzio cannot establish priority over the '205 Registration, cannot establish the '205 Registration was distinctive prior to Gibson's use of cream-colored pickups, nor can DiMarzio establish a valid, protectible interest in the '205 Registration.

127.     DiMarzio cannot establish the '205 Registration was famous at the time Gibson began using cream-colored pickups on its guitar.

128.    There is no likelihood of dilution by blurring or by tarnishment as a result of Gibson's continued use of cream-colored or double cream-colored pickups.

129.    Gibson is therefore entitled to a judicial declaration that Gibson has not diluted and is not diluting the '205 Registration.

## COUNT III
### Declaratory Judgement of Invalidity and Unenforceability of the '205 Registration

130.    Gibson hereby repeats and incorporates paragraphs 1-118.

131.    DiMarzio cannot establish a valid, protectable interest in the '205 Registration because it is generic and/or functional.

132.    Gibson is therefore entitled to a judicial declaration that Gibson is not infringing the '205 Registration.

## COUNT IV
### Declaratory Judgement of Non-Infringement of the DiMarzio's Registration No. 1,096,579 ("'579 Registration")

133.    Gibson hereby repeats and incorporates paragraphs 1-118.

134.    An actual, justiciable, and continuing case or controversy exits between Gibson and DiMarzio regarding Gibson's alleged infringement of DiMarzio's '579 Registration. DiMarzio has accused Gibson of infringing the '579 Registration.  Gibson denies the allegations.

135.    DiMarzio cannot establish priority over the '579 Registration, cannot establish the '579 Registration was distinctive prior to Gibson's use, nor can DiMarzio establish a valid, protectible interest in the '579 Registration.

136.    There is no likelihood of confusion, mistake, or deception as to the affiliation, connection, or association of DiMarzio with Gibson as to the origin, sponsorship, or approval of the parties' respective products.

137.    Gibson is therefore entitled to a judicial declaration that Gibson: (a) has not

infringed, and is not infringing, the '579 Registration pursuant to 15 U.S.C. § 1114(1); (b) has not

engaged in and is not engaging in counterfeiting of the '579 Registration 15 U.S.C § 1114(1); and

(c) has not engaged in and is not engaging in false designation of origin or unfair competition with

respect to the '579 Registration pursuant to 15 U.S.C. § 1125(a).

138.    Alternatively, Gibson is entitled to a judicial declaration that Gibson is the senior

user to the '579 Registration and DiMarzio cannot prevent Gibson from using the mark.

## COUNT V
### Declaratory Judgement of No Dilution of the '579 Registration

139.    Gibson hereby repeats and incorporates paragraphs 1-118.

140.    DiMarzio cannot establish priority over the '579 Registration, cannot establish the

'579 Registration was distinctive prior to Gibson's use of cream-colored pickups, nor can DiMarzio

establish a valid, protectible interest in the '579 Registration.

141.    DiMarzio cannot establish the '579 Registration was famous at the time Gibson

began using cream-colored pickups on its guitar.

142.    There is no likelihood of dilution by blurring or by tarnishment as a result of

Gibson's continued use of cream-colored or double cream-colored pickups.

143.    Gibson is therefore entitled to a judicial declaration that Gibson has not diluted and

is not diluting the '579 Registration.

## COUNT VI
### Declaratory Judgement of Invalidity and Unenforceability of the '579 Registration.

144.    Gibson hereby repeats and incorporates paragraphs 1-118.

145.    DiMarzio cannot establish a valid, protectable interest in the '579 Registration because it

is generic.

146.    Gibson is therefore entitled to a judicial declaration that Gibson is not infringing

the '579 Registration.

**COUNT VII**
**Cancellation of DiMarzio's '205 Registration for**
**Genericness Under Section 37 of the Lanham Act, 15 U.S.C. § 1119**

147.    Gibson hereby repeats and incorporates paragraphs 1-118.

148.    Gibson has advertised and offered for sale cream colored humbucker pickups for over fifty years.

149.    Since Gibson debuted cream-colored humbucker pickups in 1959, numerous third-party guitar companies and pickup manufacturers have been and/or are using and offering for sale pickups in the United States using a cream color identical or substantially similar to the goods offered under the '205 Registration without authorization from DiMarzio.

150.    As a result, the public does not associate the goods offered under the '205 Registration as a source identifier.

151.    Thus, the '205 Registration is incapable of functioning as a trademark and is generic.

152.    Gibson and other guitar manufacturers have a competitive and equal right to use the double cream color in the '205 Registration because it is a commonplace color used on guitar pickups and other guitar accessories that does not serve as a source-identifier.

153.    Because the design embodied in the '205 Registration cannot serve as a source-identifier, the '205 Registration inappropriately and unfairly gives DiMarzio trademark rights, causing injury and damage to Gibson and other guitar and pickup manufacturers.

154.    Accordingly, this Court should cancel DiMarzio's '205 Registration pursuant to Section 37 of the Trademark Act, 15 U.S.C. § 1119, on the ground that the '205 Registration design is generic for pickups and is incapable of functioning as a trademark.

## COUNT VIII
### Cancellation of DiMarzio's '579 Registration for
### Genericness Under Section 37 of the Lanham Act, 15 U.S.C. § 1119

155.    Gibson hereby repeats and incorporates paragraphs 1-118.

156.    Gibson's Seth Lover invented humbucker pickups in 1955, and Gibson started advertising, marketing, offering for sale, and selling guitars using the humbucker pickup design as early as 1956 using the phrase "Patent Applied For."

157.    Immediately, the guitar industry recognized the quality of these humbucker pickups and began widely referring to them as "PAF" pickups.

158.    Gibson has advertised and offered for sale PAF humbucker pickups for over fifty years in the United States.

159.    Since Gibson debuted the PAF pickups, numerous third-party guitar companies and pickup manufacturers have been and/or are using and offering for sale pickups in the United States using the word "PAF" identical to the wordmark subject to the '579 Registration without authorization from DiMarzio.

160.    As a result, the public does not associate the goods offered under the '579 Registration as a source identifier to the DiMarzio.

161.    Rather, the guitar industry still consistently uses the term PAF to refer to *Gibson's* humbucker pickups and to give the impression to consumers that the respective pickup embodies the qualities of Gibson's original PAF humbucker pickups of the late 1950s and early 1960s.

162.    Thus, the '579 Registration is incapable of functioning as a trademark and is generic as used with guitar pickups.

163.    Gibson and other guitar and pickup manufacturers have a competitive and equal right to use the word "PAF" contained in the '579 Registration because it is a commonplace word

used to market and advertise guitar pickups that does not serve as a source-identifier.

164.    Because the word "PAF" that is subject to the '579 Registration cannot serve as a source identifier, the '579 Registration inappropriately and unfairly gives DiMarzio trademark rights, causing injury and damage to Gibson and other guitar and pickup manufacturers.

165.    Accordingly, this Court should cancel DiMarzio's '579 Registration Section 37 of the Trademark Act, 15 U.S.C. § 1119, on the ground that the word "PAF" contained in the '579 Registration is generic for pickups and is incapable of functioning as a trademark.

### COUNT IX
### Cancellation of DiMarzio's '205 Registration for Functionality
### Under Section 37 of the Lanham Act, 15 U.S.C. § 1119

166.    Gibson hereby repeats and incorporates paragraphs 1-118.

167.    Pursuant to Section 14 of the Lanham Act, 15 U.S.C. § 1052, "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it . . . (e) consists of a mark which . . . (5) comprises any matter that, as a whole, is functional."

168.    The cream color used with the goods sold under the '205 Registration is commonly used in the guitar industry on the guitar accessories such as the pickguard, toggle switch washer, pickup mounting rings, and the pickups to provide a complimentary or contrasting accent to the finish of the guitar.

169.    Guitar players often modify their guitars by switching out various components, including the pickups.

170.    A robust industry of pickup manufacturers offering for sale pickups for guitarists to add to their guitars exists, and pickup manufacturers make pickups in colors that match with the other guitar accessories that may appear on a guitar.

171.    Thus, the cream color is functional when used with pickups because it matches the other common cream-colored guitar accessories such as the pickguard, toggle switch washer, and pickup mounting rings.

172.    The cream color is further functional when used with pickups because it provides a contrasting and complimentary color to the finish of the guitar, provides contrast when winding the bobbins, and is less expensive than black-colored bobbins.

173.    Accordingly, the cream color used with the goods sold under the '205 Registration is functional.

174.    DiMarzio's trademark rights in the '205 Registration when used with pickups puts competitors at a non-reputational disadvantage that is not allowed by trademark law.

175.    As such, Gibson requests cancellation of the '205 Registration pursuant to Section 37 of the Trademark Act, 15 U.S.C. § 1119, on the ground that the '205 Registration design is functional for pickups and is incapable of functioning as a trademark.

### COUNT X
### Cancellation of DiMarzio's '205 Registration for Fraud
### Under Section 37 of the Lanham Act, 15 U.S.C. § 1119

176.    Gibson hereby repeats and incorporates paragraphs 1-118.

177.    Gibson invented the double cream humbucker pickup design in the 1950s—twenty years before DiMarzio created its imitation product and filed the Double Cream Humbucker Application.

178.    When Gibson invented the double cream humbucker pickup, it was used on some of Gibson's most famous, historically significant, and sought-after guitars in its over 100-year history, including the 1959 Gibson Les Paul® guitar.

179.    Although Gibson originally sold its guitars featuring the double cream humbucker

38

pickup with pickup covers, both Gibson and DiMarzio acknowledge soon after Gibson invented the double humbucker pickups, it became widespread practice for guitar players to remove the pickup covers to expose the black, black and cream, or double cream humbucker pickups on their Gibson guitars.

180.    Since its invention in the 1950s, Gibson's double cream humbucker design became highly collectible, famous, and inexorably associated with Gibson and its most historically significant guitar, the 1959 Gibson Les Paul®.

181.    Gibson's double cream humbucker pickups functioned as a trademark of Gibson's as early as 1959 through at least the late 1970s when DiMarzio filed the Double Cream Humbucker Application.

182.    Thus, Gibson owned and had exclusive right to the double cream humbucker mark at the time DiMarzio filed the Double Cream Humbucker Application and when DiMarzio made affirmative statements regarding its entitlement to the double cream humbucker mark to the USPTO.

183.    More specifically, DiMarzio made misrepresentations to the USPTO during the prosecution of the Double Cream Humbucker Application when it made several misleading or false affirmative statements to the USPTO.

184.    First, in the Blucher Double Cream Humbucker Declaration submitted with the Double Cream Humbucker Application, DiMarzio's Vice President falsely claimed DiMarzio was the owner of the double cream humbucker mark and that no other person or company had the right to use the mark in commerce. [*See* Exhibit C.]

185.    Next, in response to the January 17, 1979 Office Action, Larry DiMarzio's July 5, 1979 Declaration made *several* misleading or false statements, namely:

- that "**no other person, firm, corporation, or association has the right to use said mark in commerce**;"

- that "**prior to the introduction of the cream-colored double bobbin configuration of the present application, no guitar pickups were identified by the cream-colored double bobbin configuration**;"

- that "**Gibson Les Paul guitar, came on the market in approximately 1957, with black bobbins under a cover**;"

- that "**the pickup bobbins under the covers in the Les Paul guitars were always either black or black-like navy blue, with the exception of a very short period in 1959, when some bobbins may have been white**."

[*See* Exhibit E (emphasis added).]

186.    Next, DiMarzio made further misrepresentations to the USPTO when it submitted Larry DiMarzio's Section 8 and 15 Declaration wherein, Larry stated: " he believes [DiMarzio] to be the owner of the trademark cited in the within declaration; that to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other persons, to cause mistake, or to deceive." [*See* Exhibit F.]

187.    The foregoing statements are either misleading or false because they misrepresent the origin, ownership, history, and significance of double cream humbucker pickups.

188.    More specifically and as discussed throughout this Notice, Gibson invented, popularized, and had ownership to the double cream humbucker design starting in 1956 when Gibson began outfitting some of the most famous guitars in Gibson's history, including the Les Paul® guitar.

189.    Gibson's humbucker pickups appeared in black, black and cream, or double cream, and the double cream humbucker pickups were particularly popular and collectable, especially due to its use with the iconic 1959 Gibson Les Paul® in the Cherry Sunburst.

190.    Thus, by the late 1950s and through the 1970s, double cream humbucker pickups were associated with and served as a source of indicator for Gibson.

191.    Furthermore, the later admissions of Larry DiMarzio—the founder and President of DiMarzio—make clear that DiMarzio **was aware of Gibson's ownership of and entitlement to the double cream humbucker mark at the time DiMarzio made the foregoing misleading or false statements to the USPTO during the prosecution and maintenance of the Double Cream Humbucker Application.**

192.    In the DiMarzio Video and the comments following the DiMarzio Video, Larry DiMarzio makes clear he possessed highly technical and historical knowledge regarding Gibson's pickups and the guitars they appeared on.

193.    Furthermore, in the DiMarzio Video, Larry DiMarzio acknowledges the notoriety, fame, reputation, and collectability of Gibson's double cream humbucker pickups.

194.    Larry DiMarzio makes clear that he was collecting Gibson's late 1950s Les Paul® guitars at least in the early 1970s.

195.    Larry DiMarzio explains that he traded his 1958 Les Paul® guitar for his 1959 Les Paul® guitar in the Cherry Sunburst finish with double cream PAF humbucker pickups in **1974**—the same year DiMarzio claims it first used the double cream humbucker mark and three years prior to DiMarzio filing the Double Cream Humbucker Application.

196.    Thus, due to DiMarzio's extensive knowledge of Gibson's double cream humbucker pickups, acknowledgement of the fame thereof, and knowledge that the double cream

humbucker pickups were inextricably associated with Gibson and its famous guitars, DiMarzio knew or had no reasonable basis to not believe that a likelihood of confusion would result from DiMarzio's use of the double cream humbucker design.

197.    As such, DiMarzio knowingly made false statements and misrepresentations to the USPTO when it filed and prosecuted the Double Cream Humbucker Application.

198.    DiMarzio made these false statements and misrepresentations with the intent to deceive the USPTO to procure registration to which DiMarzio was not entitled.

199.    Upon information and belief, the USPTO relied on the false statements and other misrepresentations DiMarzio made during the prosecution of the Double Cream Humbucker Application when the USPTO granted DiMarzio the '205 Registration.

200.    Furthermore, upon information and belief, the USPTO relied on the false statements and other misrepresentations DiMarzio made in its Trademark Act Section 8 and 15 Declaration when accepting such Declaration.

201.    Thus, through its submission, prosecution, and maintenance of the Double Cream Humbucker Application despite knowing Gibson's ownership of the double cream humbucker design, DiMarzio made a false statement of material fact to the USPTO with the intent to deceive the USPTO into authorizing DiMarzio's Double Cream Humbucker Application for publication and eventual registration.

202.    Accordingly, this Court should cancel DiMarzio's '205 Registration pursuant to Section 37 of the Trademark Act, 15 U.S.C. § 1119, on the ground that the '205 Registration was procured and maintained through fraud.

## COUNT XI
### Cancellation of DiMarzio's '579 Registration for Fraud
### Under Section 37 of the Lanham Act, 15 U.S.C. § 1119

203.    Gibson hereby repeats and incorporates paragraphs 1-118.

204.    Gibson created the "patent applied for" humbucker pickups in the late 1950s—
twenty years before DiMarzio created its imitation "PAF" pickups and filed its PAF Application.

205.    When Gibson and Seth Lover invented its PAF pickups, it has been used (and
continues to be used) on some of Gibson's most famous, historically significant, and sought-after
guitars in its over 100-year history, including the 1959 Gibson Les Paul® guitar.

206.    Due to the highly desired sound produced by Gibson's PAF humbuckers and the
desirability of the famous Gibson guitars equipped with Gibson's PAF humbuckers in the late
1950s and early 1960s, Gibson's PAF humbuckers became famous, highly collectable, and
inextricably associated with Gibson.

207.    As a result, the terms "patent applied for," or "PAF" for short, were widely and
commonly known to refer to Gibson's PAF humbuckers throughout the guitar industry from the
late 1950s through at least the late 1970s.

208.    The terms "patent applied for" or "PAF" functioned as a trademark of Gibson's
when used with guitar pickups as early as 1956 through at least the late 1970s when DiMarzio
filed the PAF Application.

209.    Thus, Gibson owned and had exclusive right to the PAF mark at the time DiMarzio
filed the PAF Application and when DiMarzio made affirmative statements regarding its
entitlement to the PAF mark to the USPTO.

210.    More specifically, DiMarzio made misrepresentations to the USPTO during the
prosecution of the PAF Application when it made several misleading or false affirmative

43

statements to the USPTO.

211.    First, in the Blucher PAF Declaration submitted with the PAF Application, DiMarzio's Vice President falsely claimed DiMarzio was the owner of the PAF mark and that no other person or company had the right to use the mark in commerce. [*See* Exhibit G.]

212.    Next, in response to the August 11, 1977 Office Action where the USPTO specifically asked DiMarzio: "**Does the term PAF have any established and/or accepted significance or meaning within the applicant's trade or industry?**" (*See* Exhibit I (emphasis added), DiMarzio responded affirmatively: "**PAF has no established and/or accepted significance or meaning within the applicant's industry**." [*See* Exhibit I (emphasis added).]

213.    As discussed throughout this Notice, as early as 1956 and through at least the 1970s, "patent applied for" or "PAF" had an established, widely accepted meaning in the guitar industry, namely, the terms were associated with Gibson and its PAF humbucker pickups.

214.    Furthermore, Larry DiMarzio made several other misleading statements in the February 3, 1978 Response, namely:

- That DiMarzio's PAF pickup "**is a specific replacement part to fit into a particular guitar sold under the trademark GIBSON;**" and

- "Since all Gibson guitars and pickups are sold under the Gibson trademark, the desired tone or tonal quality of the vintage pickup is **sometimes identified by referring to it as the sound in the Gibson Humbucking pickup which carried the marking 'patent applied for.'**"

[*See* Exhibit I (emphasis added).]

215.    These statements are misleading because they make reference to but obscure the nature of the "patent applied for" or "PAF" mark Gibson owned at the time DiMarzio filed the

PAF Application.

216.    DiMarzio purposefully and in a misleading manner omitted that the part which the DiMarzio PAF pickup intended to replace was a famous, highly sought-after *Gibson* "patent applied for" or "PAF" humbucker pickup that had become widely known in the guitar industry as having been created by and associated with Gibson.

217.    DiMarzio further obscures the truth when it claims that the "vintage pickup is **sometimes identified by referring to it as the sound in the Gibson Humbucking pickup which carried the marking 'patent applied for**.'"

218.    This statement is misleading because, at the time DiMarzio filed the PAF Application, the "patent applied for" or "PAF" terms were used *frequently and exclusively* used to refer to Gibson's famous PAF pickups that originated on Gibson's late 1950s and early 1960s Les Paul® guitars.

219.    Next, DiMarzio made further misrepresentations to the USPTO when it submitted Larry DiMarzio's Section 8 and 15 Declaration wherein, Larry stated: "he believes [DiMarzio] to be the owner of the trademark cited in the within declaration; that to the best of his knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other persons, to cause mistake, or to deceive." [*See* Exhibit J.]

220.    The later admissions of Larry DiMarzio—the founder and President of DiMarzio— make clear that DiMarzio **was aware of Gibson's ownership of and entitlement to the PAF mark at the time DiMarzio made the foregoing misleading or false statements to the USPTO during the prosecution and maintenance of the PAF Application.**

221.    In the DiMarzio Video and the comments following the DiMarzio Video,

Larry DiMarzio makes clear he possessed highly technical and historical knowledge regarding Gibson's pickups and the guitars they appeared on.

222.    Furthermore, in the DiMarzio Video, Larry DiMarzio acknowledges the notoriety, fame, reputation, and collectability of Gibson's PAF humbuckers.

223.    Larry DiMarzio makes clear that he was collecting Gibson's late 1950s Les Paul® guitars at least in the early 1970s.

224.    Larry DiMarzio explains that he traded his 1958 Les Paul® guitar for his 1959 Les Paul® guitar in the Cherry Sunburst finish with double cream PAF humbucker pickups in **1974**— two years *before* DiMarzio claims it first used the PAF mark and one year prior to DiMarzio filing the PAF Application.

225.    As such, Larry DiMarzio knew Gibson invented and popularized the "Patent Applied For" or "PAF" humbucker pickups and that the PAF pickups were widely known and associated with Gibson guitar industry at the time DiMarzio first started using the PAF Mark and when it filed the PAF Application.

226.    Thus, due to DiMarzio's extensive knowledge of Gibson's PAF pickups, acknowledgement of the fame thereof, and knowledge that the PAF pickups were inextricably associated with Gibson and its famous guitars, DiMarzio knew or had no reasonable basis to not believe that a likelihood of confusion would result from DiMarzio's use of the PAF mark.

227.    As such, DiMarzio knowingly made false statements and misrepresentations to the USPTO when it filed and prosecuted the PAF Application.

228.    DiMarzio made these false statements and misrepresentations with the intent to deceive the USPTO to procure registration to which DiMarzio was not entitled.

229.    Upon information and belief, the USPTO relied on the false statements and other

misrepresentations DiMarzio made during the prosecution of the PAF Application when the USPTO granted DiMarzio the '579 Registration.

230.    Furthermore, upon information and belief, the USPTO relied on the false statements and other misrepresentations DiMarzio made in its Trademark Act Section 8 and 15 Declaration when accepting such Declaration.

231.    Thus, through its submission, prosecution, and maintenance of the PAF Application despite knowing Gibson's ownership of the PAF mark, DiMarzio made a false statement of material fact to the USPTO with the intent to deceive the USPTO into authorizing DiMarzio's PAF Application for publication and eventual registration.

232.    Accordingly, this Court should cancel DiMarzio's '579 Registration pursuant to Section 37 of the Trademark Act, 15 U.S.C. § 1119, on the ground that the '579 Registration was procured and maintained through fraud.

## COUNT XII
### Intentional Interference with Gibson's Existing Contracts and Business Relations Under Texas Common Law

233.    Gibson hereby repeats and incorporates paragraphs 1-118.

234.    For years, Gibson has entered and continues to enter contracts with guitar and pickup dealers, distributors, retailers, and other entities to Gibson-branded guitars and pickups, including guitars with pickups that contain cream color.

235.    As described above, DiMarzio had actual and constructive knowledge of the existence of and Gibson's interest in and rights under its contractual relationships with various guitar and pickup dealers, distributors, and retailers when DiMarzio sent correspondence to Guitar Center, Sweetwater, and other Gibson/DiMarzio dealers regarding Gibson's use of cream/white-colored pickups and PAF.

236.    With the knowledge of Gibson's contractual relationship, DiMarzio willfully and intentionally, and with conscious disregard for the legally protected rights of Gibson, interfered with those protected rights by directing communications to Gibson's contracted dealers and retailers.

237.    DiMarzio sent these communications wrongfully and with the willful intent to interfere with Gibson's business and cause lost sales and loss of contractual relationship by: (1) stating Gibson was engaging in blatant trademark infringement; (2) accusing "numerous dealers" of running ads for Gibson's products "that mislead consumers as to the source of humbuckers in that color;" and (3) demanding that dealers remove listings and Gibson's products bearing crème colored pickups, including Gibson's Double Trouble models and aftermarket pickups.

238.    As a result of the foregoing willful and intentional acts, DiMarzio interfered with Gibson's existing contracts and business relations by causing dealers, distributors, and retailers— including those named above—to stop ordering and/or selling Gibson's products bearing cream (or white) colored pickups.

239.    DiMarzio's conduct has caused Gibson substantial harm and damages in the form of, among other things, losses in present and future revenue and profit from the loss in dealer relationships and the decrease in the offer for sale of Gibson's guitar products bearing cream-colored pickups.

240.    DiMarzio's actions constitute intentional interference with Gibson's existing contracts and business relations in violation of Texas common law.

**COUNT XIII**
**Intentional Interference with Gibson's Prospective Contracts and Business Relations**
**Under Texas Common Law**

241.    Gibson hereby repeats and incorporates paragraphs 1-118.

242.    For years, Gibson has entered and continues to enter contracts with guitar and pickup dealers, distributors, retailers, and other entities to Gibson branded guitars and pickups, including guitars with pickups that contain cream color.

243.    DiMarzio is contractually engaged with numerous dealers throughout the US to sell and advertise Gibson guitar and pickup products as mentioned above, and DiMarzio reasonably anticipates continuing to enter similar contracts and business relations in the future.

244.    DiMarzio interfered with and prevented Gibson's reasonably anticipated future contracts and business relations by engaging in the independently tortious act of intentional interference with Gibson's existing contracts and business relations, as described above, including by sending cease and desist letters regarding Gibson products to dealers, distributors, and retailers that Gibson had a reasonable probability of entering contractual relationships.

245.    DiMarzio sent these communications wrongfully and with the willful intent to interfere with Gibson's business and cause lost sales and loss of contractual relationship by: (1) stating Gibson was engaging in blatant trademark infringement; (2) accusing "numerous dealers" of running ads for Gibson's products "that mislead consumers as to the source of humbuckers in that color;" and (3) demanding that dealers remove listings and Gibson's products bearing crème colored pickups, including Gibson's Double Trouble models and the aftermarket double white pickups.

246.    As a result of the foregoing willful and intentional acts, DiMarzio interfered with and prevented Gibson's prospective contracts and business relations by causing current and

prospective dealers, distributors, and retailers—including those named above—to not order and/or sell Gibson's products bearing cream colored pickups and/or refrain from entering into contractual relationships with Gibson that were reasonably probable but for DiMarzio's unlawful interference.

247.    DiMarzio had the conscious desire to interfere with Gibson's ongoing contracts and/or prevent Gibson's future relationships with dealers, distributors, and retailers from occurring, and/or DiMarzio knew that interference was certain or substantially certain to occur because of its conduct.

248.    DiMarzio's conduct has caused Gibson substantial harm and damages in the form of, among other things, losses in present and future revenue and profit from the loss in dealer relationships and the decrease in the offer for sale of Gibson's guitar products bearing cream-colored pickups.

249.    DiMarzio's actions constitute intentional interference with Gibson's existing contracts and business relations in violation of Texas common law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Gibson, Inc. prays for judgment as follows:

1.    That judgment be entered in favor of Plaintiff on all causes of action set forth herein.

2.    An Order directing the Director of the U.S. Patent and Trademark Office to cancel U.S. Trademark Registration Nos. 1,169,205 and 1,096,579 with prejudice on the grounds they are generic;

3.    An Order directing the Director of the U.S. Patent and Trademark Office to cancel U.S. Trademark Registration Nos. 1,169,205 with prejudice on the grounds it is functional;

4.      An Order directing the Director of the U.S. Patent and Trademark Office to cancel U.S. Trademark Registration Nos. 1,169,205 and 1,096,579 with prejudice on the grounds they were procured and maintained through fraud;

5.      A Declaratory Order that Gibson is the senior user of PAF and cream colored pickups and DiMarzio cannot prohibit Gibson's use of those marks;

6.      An Order finding that DiMarzio has intentionally interfered with Gibson's contracts and business relations;

7.      An Order finding that DiMarzio has intentionally interfered with Gibson's prospective contracts and business relations;

8.      An Order awarding Gibson its actual damages from DiMarzio's intentional interference, including Gibson's lost sales and profits;

9.      That Gibson be awarded such other monetary damages, recovery and awards as appropriate under the law;

10.     That Gibson be awarded the costs of this action and its disbursements, and reasonable attorneys' and investigatory fees incurred; and

11.     An injunction enjoining DiMarzio, its officers, directors, principals, agents, servants, affiliates, employees, attorneys, representatives, successors and assigns, and all those in privy or acting in concert or participation with DiMarzio, and each and all of them, be preliminarily and permanently enjoined and restricted from directly or indirectly engaging in or sending any communication with guitar and pickup dealers, retailers, commercial associates, distributors, suppliers, resellers, and customers that interfere with Gibson's contracts and business relations.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Gibson respectfully demands a trial by jury on all issues properly before a jury in this action.

Respectfully submitted, this 12th day of September 2025.

/s/ Stephen D. Howen /
Stephen D. Howen
State Bar. No. 10117800
LAW OFFICES OF STEVE HOWEN
7111 Bosque Boulevard
Suite 305
Waco, Texas 76710
Phone: (254) 826-6526
Fax: (254) 822-4926
Email: steve@stevehowenlegal.com

Andrea E. Bates
*Pro Hac Forthcoming*
Kurt Schuettinger
*Pro Hac Forthcoming*
Elizabeth Andujar
*Pro Hac Forthcoming*
BATES & BATES LLC
1890 Marietta Boulevard NW
Atlanta, Georgia 30318
Phone: (404) 228-7439
Fax: (404) 963-6231
Email: abates@bates-bates.com
Email: kschuettinger@bates-bates.com
Email: eandujar@bates-bates.com
ATTORNEYS GIBSON BRANDS, INC.